UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF  NEW YORK
_____

SHERYL FORD,

                                    Plaintiff

                                                                DECISION AND ORDER

-vs-
                                                                09-CV-6280 CJS

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                                    Defendant.
_____


APPEARANCES

For the Plaintiff:             Alecia A. Elston, Esq.
                               Segar & Sciortino
                               400 Meridian Center, Suite 320
                               Rochester, New York 14618

For the Defendant:             Kathryn L. Smith, Esq.
                               Assistant United States Attorney
                               100 State Street
                               Rochester, New York 14614


INTRODUCTION

       This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

which denied plaintiff Sheryl Ford's ("Plaintiff") application for disability insurance

benefits ("SSDI").  Now before the Court is Defendant's motion [#6] for judgment on the

pleadings, and Plaintiff's cross-motion [#9] for the same relief.  For the reasons that

follow, Defendant's motion is granted and Plaintiff's motion is denied.

1

PROCEDURAL HISTORY

On or about May 17, 2005, Plaintiff applied for SSDI benefits, claiming to be disabled since August 28, 2003. Plaintiff alleged that she was disabled due to "back pain," emphysema ("COPD"), carpal tunnel syndrome ("CTS"), "heart problem," and arthritis. (136)[1] When asked to state how these problems limited her ability to work, Plaintiff responded: "Trouble breathing, walking, standing for long periods, hand swells when I use it." (137) On October 4, 2005, Defendant denied the application. (109) On March 6, 2008, a hearing was held before Administrative Law Judge ("ALJ") Kenneth G. Levin. The issue before the ALJ was whether Plaintiff was disabled from working at any time since her alleged onset date, August 28, 2003.[2] At the hearing, Plaintiff's attorney maintained that Plaintiff had a combination of physical and mental impairments that prevented her from working. (32-34) With regard to physical limitations, Plaintiff's counsel emphasized that Plaintiff experienced chronic pain, shortness of breath with exertion, and general difficulty performing activities of daily living. (33) As for mental impairments, Plaintiff's attorney indicated that Plaintiff met or equaled the listed impairment for a depressive syndrome, and had low global assessment functioning ("GAF") scores at times. (34) Plaintiff's attorney further cited a report by Plaintiff's mental health therapist, which indicated that Plaintiff could not work "in any capacity." (34) On March 18, 2008, the ALJ issued his decision, finding that Plaintiff was not disabled. (14-30) Plaintiff appealed, and on March 30, 2009, the Appeals Council

_____

[1]Unless otherwise noted, citations are to the Administrative Record.

[2]Plaintiff was insured through December 31, 2008.

denied Plaintiff's request for review.

On May 29, 2009, Plaintiff commenced this action.[3] Plaintiff has now abandoned her claim for benefits prior to February 1, 2006. Consequently, the issue is whether the Commissioner correctly denied benefits for the period February 1, 2006, through the date of the ALJ's decision, March 18, 2008. Plaintiff contends that the ALJ's decision must be reversed, because the ALJ failed to properly apply the treating physician rule, and failed to properly assess Plaintiff's credibility.

On September 16, 2010, counsel for the parties appeared before the undersigned for oral argument.

VOCATIONAL HISTORY

Plaintiff was forty-seven years of age at the time of the hearing, and had completed high school. (51, 143) Plaintiff was last employed in 2003, as a book binder, a job which she performed for approximately ten years. (53) Plaintiff stated that she was laid off from this job in 2003, a few months after she had CTS surgery on her right wrist. (55) Specifically, Plaintiff had surgery in November, returned to work in January, and was laid off almost immediately, in January or February. (55) Prior to working as a book binder, Plaintiff worked a few years wrapping meat in a grocery store. (70)

At the administrative hearing, held on March 6, 2008, the ALJ asked Plaintiff to describe the symptoms that prevented her from working, and she responded: "My back, my breathing and my hands." (55) As for her back, Plaintiff stated that she has

---

[3] Subsequently, the parties each obtained extensions of time to file the subject motions.

"shooting" pain in her lower back, which radiates into her legs, particularly on the right side. (56) Plaintiff said that she experiences such pain every day. (57) Plaintiff stated that she took Darvocet and Neurontin for pain, but that the medications provided only slight relief. (58) As for her breathing, Plaintiff stated that she experienced shortness of breath when walking and "doing things around the house." (58) Plaintiff stated that she smoked less than a pack of cigarettes per day, and that she had previously smoked one-and-a-half packs per day. (59)  As for her hands, Plaintiff stated that she experienced pain, swelling, and numbness in both hands, while doing things like washing dishes. (60)  Plaintiff also stated that she had shoulder pain, "depending [on] what [she] lift[ed]." (63)

With regard to walking and standing, Plaintiff stated that she could walk less than a quarter mile on bad days, and slightly more on good days, and that she could stand for fifteen minutes at most. (67) Plaintiff indicated that she could sit for "maybe five minutes, ten minutes tops," before needing to switch position, either by standing up or lying down. (68)  Plaintiff stated that she was in pain during the hearing, but that it was "not so bad," because she had taken Darvocet. (68) Plaintiff also stated that she could not stoop, bend, or crouch, because of back pain. (73) She further stated that she could not grasp or grip well with her hands. (78)  Plaintiff additionally stated that she could lift and carry only five pounds. (68)

Plaintiff also indicated that she experienced psychiatric symptoms, consisting of depression, anxiety, irritability, racing thoughts, and trouble sleeping. (64) Plaintiff stated that she had been having such psychiatric symptoms for "at least ten years." (66) Plaintiff indicated that her psychiatric symptoms worsened when she drank alcohol, and

that she had not used alcohol to excess in a year. (66) Plaintiff also stated that she had used cocaine fifteen years ago. (67) Plaintiff stated that she sometimes had suicidal thoughts, due to stress in her life, and that she had made five or six suicide attempts. (75)

Plaintiff indicated that she took Darvocet up to six times per day for pain (68), and that she also took Trazodone at night. (71) Plaintiff also took medications for her mental symptoms, including Celexa and Vistaril. (87-88) Plaintiff stated that she experienced "a lot" of side effects from her medications. (71) However, when asked to describe them, she mentioned only that Trazodone, which she took at night, caused her to experience congestion, dry mouth, and agitation. (71)

Plaintiff indicated that she was able to perform household chores, including cooking, cleaning, and shopping. (68) Plaintiff stated, though, that she was "tired all the time," and needed to sleep a couple of times during the day. (68-69) She stated that she spends her days watching television, reading, and socializing occasionally. (69) Plaintiff indicated that she had "maybe one" good day per week, when she was "able at least to get through and do things." (73)

MEDICAL EVIDENCE

Plaintiff's medical history was summarized in Defendant's brief, and need not be repeated here in its entirety. It is sufficient for purposes of this Decision and Order to note the following facts.

In February 2003, Clifford Everett, M.D. ("Everett"), noted that Plaintiff was complaining of low back pain, radiating into her leg, with prolonged standing. (210) Everett noted that Plaintiff's MRI showed degenerative changes at L3-L4, but "no

significant neural encroachment." (210).  Consequently, Everett was "not sure what is causing the right leg symptoms." (*Id*.).  Everett ordered a nerve conduction study, which was normal. (211) Eventually, Everett treated Plaintiff with a steroid injection, but Plaintiff claimed that it was not helpful. (214) In May 2005, Plaintiff returned to see Everett, complaining of continued back pain.  Everett prescribed Flexeril, and advised Plaintiff to continue walking, standing, and performing other activities, and to try physical therapy. (215)    On January 12, 2007, Everett reported that Plaintiff's pain had become "much more diffuse," and that her "disability does fit in to a mild to moderate partial range." (329)  Everett added that, "By definition, this indicates that she can work. I think she can work in a light-duty capacity full time." (329).

Plaintiff has had numerous visits to the emergency room, on occasions when she has been intoxicated and/or taken too much medication.  On July 30, 2003, Plaintiff was admitted to Lakeside Memorial Hospital after having consumed alcohol and Darvocet. (334) Plaintiff indicated that she took the Darvocet because "I just don't care." (334) Plaintiff also tested positive for cocaine. (339)  In July 2005, Plaintiff was admitted to the hospital after overdosing on Valium and alcohol, which she reportedly took to help her sleep. (774-775) Plaintiff also tested positive for amphetamines and cannabis. (782) In February 2006, Plaintiff was admitted to the hospital for a week, after she overdosed on Klonopin and alcohol, in an apparent suicide attempt. (837) Plaintiff indicated that she was stressed and overwhelmed because of issues relating to custody of her granddaughter. (837)  On July 24, 2006, Plaintiff was seen at Strong Memorial Hospital after she overdosed on Norvasc, Effexor, and alcohol, and called 911 for help. (398-399) Plaintiff indicated that she took the pills because she was menstruating and just

wanted to be left alone, although she also allegedly stated that she "wanted to end it all." (399, 404) Plaintiff complained of agitation and racing thoughts. (402) Subsequently, Plaintiff indicated that she really did not know what happened, and that "every once in a while she gets overwhelmed and can't handle things well." (681)  On February 5, 2007, Plaintiff was taken to Park Ridge Hospital after overdosing on alcohol, Trazodone and Percocet. (623)  This overdose was treated as a suicide attempt. (623) A psychiatrist evaluated Plaintiff  "for the suicide attempt and her degree of depression," and concluded that she did not require hospitalization, but needed outpatient treatment. (623)  On June 27, 2007, Plaintiff was hospitalized after overdosing on alcohol and Neurontin. (659)  Plaintiff denied that she was suicidal, and said that she just wanted to sleep. (659) Plaintiff indicated that she was stressed by the fact that her daughter, the daughter's boyfriend, and the couple's children, were living with her, and refusing to move out. (659) Apparently, Plaintiff was intoxicated and called the police to have them remove her daughter's boyfriend from the home, but the police took her into custody instead. (664)  Upon admission, Plaintiff indicated that she was in constant pain from her back, which is a common thread running through most of Plaintiff's medical records. On August 4, 2007, Plaintiff was again hospitalized after she overdosed on alcohol, Neurontin, Darvocet, and Trazodone. (672)  On August 18, 2007, Plaintiff was seen at Strong Memorial Hospital for "acute [alcohol] intoxication," and was placed in restraints after she became combative. (427).   Plaintiff apparently was upset concerning an argument with her family. (420-421)

In January 2004, David Mitten, M.D. ("Mitten"), who performed CTS surgery on Plaintiff's right wrist, indicated that Plaintiff was "temporarily partially disabled until [her]

next appointment [on] 3/10/04." (185)   Subsequently, in January or February 2004, Plaintiff planned to return to work, but was laid off.  In July 2004, Mitten indicated that Plaintiff was physically able to return to her usual work, as book binder, four days per week, 4-5 hours per day. (186)  On July 6, 2004, Mitten noted that Plaintiff had a "normal mood and affect." (208) Mitten opined that Plaintiff had a 20% loss of use of her right hand, following the CTS surgery. (209)  On September 7, 2004, an independent medical examiner, who examined Plaintiff in connection with a worker's compensation claim, indicated that Plaintiff's wrist had reached maximum medical improvement, and that she had a 10% loss of use of her right hand. (196)

In June 2005, Patrick Wilmot, M.D. ("Wilmot"), Plaintiff's primary care physician, completed a report for the New York State Office of Disability Assistance. (220-232). Wilmot noted that Plaintiff's diagnoses included chronic low back pain, coronary artery disease, and chest pain, and that her primary symptoms were pain and decreased range of movement. (220) Wilmot reported that Plaintiff had "prob[able] mild depression." (221) Wilmot indicated that all laboratory testing was negative. (222) Wilmot indicated that Plaintiff could occasionally lift up to ten pounds, could stand and/or walk for up to six hours, and could sit without any limitation. (229).  Wilmot further indicated that Plaintiff had no limitations with regard to understanding and memory, concentration, persistence, and social interaction. (230)

On August 22, 2005, Plaintiff was examined by Harbinder Toor, M.D. ("Toor"), a non-treating consultative examiner.  Plaintiff complained to Toor of lower back pain, radiating into both legs, which was worse with bending, lifting, and vacuuming. (266) Plaintiff also complained of shortness of breath, and occasional numbness in her right

hand.  Toor's examination findings were essentially normal. (267-268) Toor observed "mild abnormal breath sounds on auscultation," and Plaintiff complained of "mild pain" in her back with flexion. (268) Straight Leg Raising test was positive bilaterally, with mild back pain.  Toor's prognosis was "fair."  (269) Toor indicated that Plaintiff should avoid "heavy exertion" and "irritants causing asthma," and that she had "mild limitation" with regard to bending, lifting, picking, and twisting of the lumbar spine. (269)

On August 22, 2005, Plaintiff was examined by Melvin Zax, Ph.D. ("Zax"), a non-treating consultative psychiatric examiner.  Plaintiff reported having trouble falling asleep, and complained of being depressed and crying for no reason. (286) She stated that she did not answer the phone and did not want to do anything, and that part of her problem was that "there is a great deal going on that involves her father who is sick with cancer." (286) Upon examination, Zax observed the following: Plaintiff's thinking was coherent; affect was full and appropriate; mood was neutral; attention and concentration were somewhat impaired; recent and remote memory were impaired; intellectual functioning was low average to borderline; and insight and judgment were fair.  Plaintiff reported being able to bathe and dress herself, cook, clean, do laundry, shop, drive, and manage her money.  As for daily activities, Zax noted that Plaintiff reportedly "gets up and has coffee, cleans house, showers, and baby-sits her granddaughter." (287) Zax concluded that Plaintiff could follow and understand simple directions.  Zax indicated that Plaintiff did "not appear to be terribly depressed at this time," and that she probably had a drinking problem.  Zax indicated that it would be helpful for Plaintiff to return to work, but added, "I do not see much motivation on her part to do that so I suspect her prognosis is poor." (288)

In March 2006, Plaintiff sought mental health treatment from Unity Health Systems, complaining of depression, anxiety, medical problems, and family problems. (581). Prior to that, Plaintiff's mental health treatment was primarily through Wilmot, her primary care physician. (587) Plaintiff indicated that her mood had considerably worsened in the last two months, with increased crying and irritability. (582) Plaintiff appeared to be moderately depressed, with a poor to fair range of affect. (585) Plaintiff was referred for treatment, but it appears that within a few months she stopped attending appointments, and in July 2006 she was discharged from treatment. (622)

In or about August 2006, Plaintiff resumed mental health treatment with Unity Health Systems, consisting primarily of therapy with Lynne Wheeler, MS Ed CAS[4] ("Wheeler"), under the supervision of psychiatrist Dinesh Nanavati, M.D. ("Nanavati"). (696) Initially, the primary diagnosis was "major depression, recurrent, moderate" (696), but later that diagnosis was changed to "mood disorder, not otherwise specified." (710, 712) In November 2006, Wheeler and Nanavati reported that Plaintiff had made good progress and attended all of her sessions, and that she reported "a big improvement in her behavior and attitude." (699) In February 2007, Wheeler and Nanavati reported that Plaintiff had "ups and downs during this assessment period." (712) Plaintiff stated that she was frustrated because she was having more pain, which her doctors were not able to alleviate. (712) In May 2007, Wheeler and Nanavati reported that Plaintiff had attended most of her appointments, and that her medications were having good results. (716) Plaintiff complained, though, of sleep disturbances due to pain. (716) In August

---

[4]Master of Science in Education, Certificate of Advanced Study.

2007, Wheeler and Nanavati reported that Plaintiff had "not done well" during the past three months. (720) Plaintiff had been to the emergency room twice for overdoses. (720) It was noted that Plaintiff had "responded best to mood stabili[zing]" medication, specifically Trazodone, which prompted Wheeler and Nanavati to consider bipolar disorder as a diagnosis. (721) In November 2007, Wheeler and Nanavati reported that Plaintiff was taking her medication with good results, and seemed to have a renewed commitment to getting well. (725)

On June 5, 2006, Plaintiff had an MRI of her lumbar spine. The MRI report stated, in pertinent part:

> There is degenerative disc disease with disc narrowing and ventral osteophytes at T10-11 and T11-12. There are Schmorl's nodes in the lower thoracic spine and at multiple lumbar levels. There is facet and ligamental hypertrophy at L2-3 with impression on the underlying thecal sac. There is mild narrowing of the AP sac dimension at this level. At L3-4, there is mild facet and ligamental hypertrophy with minimal impression on the underlying subarachnoid space. At L4-5, there is mild facet and ligamental hypertrophy with very mild impression on the underlying subarachnoid space. At L5-S1, there is no significant posterior disc herniation stenosis. . . . IMPRESSION: Mild degenerative changes at several lumbar levels with mild stenosis[5] at L2-3.

(326) On June 12, 2006, Everett reviewed the MRI report, and reported that it showed "mild lumbar spondylosis."[6] (328)

In October 2006, Wilmot's nurse practitioner, Phyllis Ruetz, NP ("Ruetz") noted that Plaintiff "definitely has stenosis symptoms." (495) In January 2007, Plaintiff

---

[5]"Spinal stenosis is a narrowing of one or more areas in [the] spine . . . [which] can put pressure on the spinal cord or spinal nerves at the level of compression." MayoClinic.com, http://www.mayoclinic.com/health/spinal-stenosis/DS00515.

[6]"Spondylosis" "is a general term for age-related wear and tear affecting the disks." MayoClinic.com, http://www.mayoclinic.com/health/cervical-spondylosis/DS0069.

complained to Ruetz that her back pain had not improved, and that she was experiencing "bilateral posterior leg pain." (514) Also in January 2007, Ruetz, under the supervision of Glenn Rechtine, M.D. ("Rechtine"), examined Plaintiff and noted that she was complaining of increased back pain and weakness in both legs. (516) Ruetz noted that Plaintiff was alert, with normal affect, had a normal gait, and negative straight leg test bilaterally. (517) Ruetz stated, "she has no deficits on exam." (518)

On February 27, 2007, Michael Stanton, M.D. ("Stanton") performed a neurological exam at Wilmot's request. (525-527). In his notes, Stanton referred to Plaintiff's MRI report, stating,

> MRI of the lumbosacral spine has shown facet hypertrophy and ligamentous hypertrophy at L2-L3, L3-L4, and L4-L5, without central canal or foraminal stenosis. She has some mild degenerative disc changes.
> ***
> She has facet hypertrophy and ligamentous change from L2 through L5. There is no central canal stenosis. She has a congenitally narrow spine from congenitally short pedicles. The foramen do not shown stenosis.

(525, 527) Stanton indicated that he could find no cause for Plaintiff's back pain. (527) ("Musculoskeletal low back pain. It is non-radicular. It is non-neuropathic. I do not have anything to offer on this complaint. . . . She has a normal neurological exam."). On March 16, 2007, Ruetz reported that she had reviewed Plaintiff's EMG report, which showed "no lumbar radiculopathy, plexopathy, or neuropathy bilaterally." (532) On August 28, 2007, Wilmot examined Plaintiff and reported that she was "less depressed." (563)

Plaintiff has smoked cigarettes since age 15. (455). As of 2004, Plaintiff indicated that she had no intention of quitting smoking, despite the fact that she was experiencing a raspy cough and difficulty breathing with exertion. (437) On March 11,

2005, Michael C. Kallay, M.D. ("Kallay") indicated that Plaintiff had "a remarkable amount of obstructive lung disease considering her age of 44," but showed "little interest" in quitting. (456) On September 17, 2005, pulmonary function testing performed by Ramon Medalle, M.D. ("Medalle") showed "moderately severe obstruction." (277) In September 2006, Plaintiff began participating in a "Smoker's Health Project," to stop smoking. (492)

In November 2007, Plaintiff's mental health therapist, Wheeler, completed an "Employability Assessment" form for the New York State Office of Temporary and Disability Assistance. (392-393, Exhibit 17F) Wheeler purported to evaluate Plaintiff both as to her physical and mental condition. Wheeler stated that Plaintiff's diagnoses included depression, alcohol abuse, anxiety, bipolar, low self-esteem, self-defeating behavior, and mood instability. (392) With regard to mental functioning, Wheeler stated that Plaintiff was moderately limited with regard to understanding and remembering instructions, carrying out instructions, maintaining attention and concentration, and moderately-to-very limited as to interacting appropriately with others. (392) Wheeler further stated that Plaintiff "cannot work in any capacity." (393) Unlike the notes by Wheeler described earlier in this Decision, which were co-signed by Dr. Nanavati, this Employability Assessment was signed only by Wheeler.

EXPERT TESTIMONY INTRODUCED AT THE HEARING

At the administrative hearing, a medical expert ("the ME"), Dr. Plotz, testified, based on his review of the medical records and his observation of Plaintiff's testimony. The ME stated that Plaintiff had good heart function following placement of a stent in 2007, a history of difficulty breathing, with moderate impairment of pulmonary function,

modest restriction in her use of her hands following successful CTS surgery, minor shoulder pain following successful treatment, and only minimal osteoarthitis in her back "that comes with aging." (79-80: "She has no disc disease, she has no arthritis, she has no nerve – " [sic]); (*see also, id.* at 85: "[T]hat is about as normal as you can get in your 40s.")  When Plaintiff's counsel asked the ME about an MRI of Plaintiff's spine performed on June 5, 2006, the ME stated that the MRI was "normal." (85: "She has almost nothing.")  The ME indicated that Plaintiff would not be limited as to sitting, standing, or walking. (84-85)  The ME stated that Plaintiff would be limited to lifting twenty pounds or less on a regular basis, with mild limitations in "fine fingering." (81) The ME indicated that Plaintiff's heart condition would not limit her ability to work. (81) ("[S]he's got excellent cardiac functioning, remarkably good.") The ME stated that Plaintiff did "not have any significant asthma," and would only need to avoid heavy smoke and fumes. (83) The ME stated that Plaintiff might have "mild emphysema," which would definitely worsen if she continued to smoke. (86)

A psychiatric expert ("the PE"), Dr. Fine, also testified at the hearing.[7]  The PE discussed Plaintiff's psychiatric records, and that the fact that, at various times, Plaintiff had been described as having mood disorder not otherwise specified, aggressive disorder, bi-polar disorder, anxiety disorder, and alcohol dependence. (88) The PE also noted that one therapist had described obsessive compulsive personality disorder, though the PE found "no rationale" for such a diagnosis. (88) The PE observed that Plaintiff had been given GAF scores of 55 and 60, "which would indicate a moderate

---

[7] Neither Fine nor Plotz examined Plaintiff, and their testimony at the hearing was based on their review of the medical record and their observation of Plaintiff during the hearing.

14

degree of dysfunction and moderate symptomatology." (88) The PE opined that Plaintiff had a depressive mood disorder not otherwise specified, and alcohol dependence. (89, 96) The VE stated that Plaintiff's symptoms appeared to be "somewhat alleviated" by her medications. (89)   The PE stated that Plaintiff probably had the mood disorder as early as 2003.  (90) The PE stated that, prior to 2007, Plaintiff's activities of daily living, socialization, concentration, and ability to function in a work setting, would have been moderately impaired by her psychiatric symptoms. (91)  From 2007 onward, the PE stated, Plaintiff's activities of daily living, socialization, and concentration, would have improved to a mild-to-moderate level of impairment.  The PE stated that prior to 2007, and disregarding the effects of Plaintiff's use of drugs and alcohol during that period, Plaintiff would have been capable of "low levels of concentration, low stress types of work, limited contact with other people." (94) The PE added that, since 2007, Plaintiff would be capable of the same type of work, but with more social interaction. (94)

At the administrative hearing, the ALJ also took testimony from a vocational expert ("the VE").  The ALJ posed this question:

> If I consider a person of the claimant's age, education and prior work who is limited to nonexertional, to jobs that are low in stress, require low levels of concentration, that require limited amounts of social interaction but which does not limit the claimant's ability to sit or stand or walk, allows her to lift and carry 20 pounds occasionally, ten pounds frequently with mild fine fingering limitations in the right, which is the dominant, hand and by mild I mean no continuous use of the right hand for fine [INAUDIBLE] Can you identify jobs at the light and sedentary levels for such a person?

(101)   The VE responded that there were several unskilled jobs that such a person could perform, such as machine tender, marker, and surveillance system monitor. (101- 102)  The VE stated that all of those jobs have a sit/stand option, to allow workers to

change position. (104)   The VE indicated, in response to questioning by Plaintiff's attorney, that an individual would not be able to perform those jobs if she was "off task" 20% of the time because she "couldn't pay attention or keep on pace or focus." (102) Similarly, the VE stated that the hypothetical person would not be able to perform those jobs if she needed to lie down twice during the workday, for up to thirty minutes each time. (102) The VE further indicated that such a person could not perform those jobs if she missed three-to-four days of work per week.  Additionally, the VE stated that two of the jobs that she identified, surveillance system monitor and bench hand, did not require lifting. (103-104)

## STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."  The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard."  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

The SSA has promulgated administrative regulations for determining when a

claimant meets this definition. First, the SSA considers whether the claimant is currently engaged in substantial gainful employment. If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities. If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted). At step five of the five-step analysis above, the Commissioner may carry his burden by resorting to the Medical Vocational Guidelines or "grids" found at 20 C.F.R. Pt. 404, Subpart P, Appendix 2. *Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996)(citation omitted); *see also*, SSR 83-10 (Stating that in the grids, "the only impairment-caused limitations considered in each rule are exertional limitations.") However, if a claimant has nonexertional impairments which "significantly limit the range of work permitted by his exertional limitations," then the Commissioner cannot rely upon the grids, and instead "must introduce the testimony of a vocational expert ["(VE")](or other similar evidence) that jobs exist in the economy which claimant can obtain or perform."[8] *Pratts v. Chater*, 94 F.3d at 39; *see also*, 20 C.F.R. § 416.969a(d).[9]

---

[8]"Exertional limitations" are those which affect an applicant's ability to meet the strength demands of jobs, such as sitting, standing, walking, lifting, carrying, pushing, and pulling. "Non-exertional limitations" are those which affect an applicant's ability to meet job demands other than strength demands, such as anxiety, depression, inability to concentrate, inability to understand, inability to remember, inability to tolerate dust or fumes, as well as manipulative or postural limitations, such as the inability to reach, handle, stoop, climb, crawl, or crouch. 20 C.F.R. 416.969a.

[9]20 C.F.R. § 416.927(d) provides, in relevant part, that, "[w]hen the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength [exertional] and demands of jobs other than the strength demands [nonexertional], we consider that you have a combination of exertional and nonexertional limitations or restrictions. . . . [W]e will not

Under the regulations, a treating physician's opinion is entitled to controlling weight, provided that it is well-supported in the record:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 416.927(d)(2); 20 C.F.R. § 404.1527(d)(2). However, "[w]hen other substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)(*citing* 20 C.F.R. § 404.1527(d)(4)). Nevertheless,

> [a]n ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion. 20 C.F.R. § 404.1527(d)(2). Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. *Id*. The regulations also specify that the Commissioner 'will always give good reasons in [her] notice of determination or decision for the weight [she] give[s] [claimant's] treating source's opinion.' *Id*.; *accord* 20 C.F.R. § 416.927(d)(2); *see also Schaal*, 134 F.3d at 503-504 (stating that the Commissioner must provide a claimant with "good reasons" for the lack of weight attributed to a treating physician's opinion).

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

Administrative Law Judges are required to evaluate a claimant's credibility

---

directly apply the rules in appendix 2 [the grids] unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations; otherwise the rule provides a framework to guide our decision."

concerning pain according to the factors set forth in 20 C.F.R. § 404.1529, which states

in relevant part:

> In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  By objective medical evidence, we mean medical signs and laboratory findings as defined in § 404.1528 (b) and (c). By other evidence, we mean the kinds of evidence described in §§ 404.1512(b) (2) through (6) and 404.1513(b) (1), (4), and (5) and (e). These include statements or reports from you, your treating or examining physician or psychologist, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work.
>
> ***
>
> In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you. (Section 404.1527 explains how we consider opinions of your treating source and other medical opinions on the existence and severity of your symptoms, such as pain.) We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

20 C.F.R. § 404.1529(a); 20 C.F.R. § 416.929(a).  The regulation further states, in

pertinent part:

> Factors relevant to your symptoms, such as pain, which we will consider include:
> (i) Your daily activities;
> (ii) The location, duration, frequency, and intensity of your pain or other symptoms;
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); 20 C.F.R. § 416.929(c)(3).

## THE ALJ'S DECISION

At the first step of the five-step sequential analysis described above, the ALJ found that plaintiff was not engaged in substantial gainful employment. At the second step of the analysis, the ALJ found that plaintiff had the following severe impairments: right hand CTS, COPD, shoulder pain, alcohol abuse and dependency, mood disorder not otherwise specified, and personality disorder, not otherwise specified. (25-26). The ALJ found that Plaintiff's complaint of back pain lacked "any acceptable medical diagnosis" and was not severe. (25). At the third step of the analysis, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

At the fourth step of the analysis, the ALJ found that Plaintiff's past relevant work consisted of "book paster" and "meat clerk." (27) The ALJ found that Plaintiff could not perform such past relevant work (27-28), and in that regard, he found that Plaintiff had the following RFC: "[N]eed to avoid exposure to very strong smoke, fumes and chemicals . . . further limited to work that [is] simple, low in stress, low in required concentration, and limited in required interpersonal interaction . . . [with the] only exertional restriction [being] that of no lifting or carrying in excess of twenty pounds."

(27).[10]  The ALJ reiterated this RFC in connection with hypothetical that he posed to the

VE:

> I asked [the VE] to assume a person of claimant's age, education and prior work experience, who could lift/carry up to 20 pounds even frequently, and had no limits on sitting, standing or walking.  Furthermore, she would have mild limitations on fine fingering with the right hand only. In addition, she should avoid heavy smoke, fumes or chemicals, and could perform only simple, low stress tasks requiring low levels of concentration and limited interaction with other people.

(28).

In making his determination regarding Plaintiff's nonexertional mental

impairments, the ALJ noted that he gave "no probative value" to Wheeler's RFC

assessment. (27).  On this point, the ALJ explained:

> The record contains a report and mental functional assessment from claimant's Unity therapist (i.e. clinical social worker) dated November 20, 2007, stating that claimant is not capable of working, but including in this consideration not only the claimant's mental health problems (including alcohol and drug abuse) but also her purported medical problems. (see Ex. 17-F).  I note that the opinion of a social worker therapist would not be entitled to special weight even if based on psychiatric conditions alone, but since such a therapist has not expertise whatever about physical conditions (and obviously does not treat them), the inclusion of such conditions into consideration (let alone the substance abuse) reduces the evidentiary value of the therapist's conclusions to basically nil.

(23-24).

At the fifth step of the sequential analysis, based on the testimony of the VE, the

ALJ determined that Plaintiff could, even with the aforementioned restrictions, perform

the following four jobs: machine tender; marker; surveillance system monitor; and

bench hand.  Consequently, the ALJ found that Plaintiff was not disabled.

---

[10]*See also, id*. at 28.

ANALYSIS

Plaintiff essentially maintains that the ALJ erred in two respects. First, she contends that the ALJ did not properly apply the treating physician rule. And second, she argues that the ALJ did not properly evaluate her credibility.

*Treating Physician Rule*

With regard to the treating physician rule, Plaintiff maintains that the ALJ gave greater weight to the opinions of non-treating physicians, Toor and Plotz, concerning her physical limitations, than he did to Plaintiff's treating physician, Wilmot. For example, Plaintiff indicates that the ALJ improperly failed to give controlling weight to Wilmot's opinion that Plaintiff could lift only ten pounds. (229, Wilmot report from June 2005). Similarly, with regard to Plaintiff's mental impairments, Plaintiff contends that the ALJ improperly disregarded the opinions of Wheeler and Nanavati, Plaintiff's treating therapist and psychiatrist, respectively, and instead relied upon the opinions of non-treating physicians Zax and Fine.

With regard to Plaintiff's ability to lift, the ALJ found that Plaintiff could "lift/carry up to 20 pounds even frequently." (28) Plaintiff contends that this was error, since Wilmot indicated that Plaintiff could not lift more than ten pounds. On this point, on April 2005, Wilmot stated, as part of a report prepared for the New York State Officer of Temporary and Disability Assistance, that Plaintiff could "occasionally" lift ten pounds. (229). Plaintiff states that the ALJ was apparently "unpersuaded" by Wilmot's opinion on this point. (Pl. Memo of Law at 7). In making his RFC determination concerning Plaintiff's ability to lift, the ALJ did not actually refer to Wilmot's RFC report. The Court notes, however, that Wilmot's report does not provide any explanation for the ten-pound

lifting restriction, and does not even list CTS as one of his "treating diagnoses." (220)

Nor is Wilmot's statement on this point supported by the rest of the medical record. In

any event, the ALJ based his finding on a number of factors. First, the ALJ noted that

Wilmot's office notes made no mention of Plaintiff's CTS since 2004. (21: "Her primary

care physician (Dr. Wilmot), who keeps excellent notes, reports not a single word about

symptoms of CTS or hand problems over the years since 2004."). Additionally, the ALJ

observed that Plaintiff's prior job as a book binder required her to lift from "ten to twenty

pounds," and that following her CTS surgery, Plaintiff believed that she could return to

that job.[11] Further, the ALJ referred to the opinion of the "independent medical expert"

(21), Andre LeFebvre, M.D. ("LeFebvre"), who examined Plaintiff in connection with her

worker's compensation claim for CTS. (187-197). LeFebvre stated that Plaintiff could

work, and that she had the following ability to lift twenty pounds frequently: "In terms of

lifting a bimanual lift should be at 50 pounds, 20 pounds frequently, and 10 pounds on a

constant basis." (192) The ALJ also referenced the testimony of Plotz, who indicated

that Plaintiff could lift up to twenty pounds frequently (24), as well as the report of Toor,

who indicated that Plaintiff had full grip strength, and had only a "mild" limitation on

lifting. (268-269). On these facts, the Court declines to find that the ALJ failed to follow

the treating physician rule. The Court further finds that the ALJ's determination,

regarding Plaintiff's ability to lift, is supported by substantial evidence.

Plaintiff further contends that the ALJ failed to apply the treating physician rule,

---

[11] As noted earlier, Plaintiff contends that the ALJ mischaracterized her testimony regarding her ability to work following her CTS, by stating that she was able to work, when Plaintiff actually stated only that she was going to "try" to work. However, Plaintiff was obviously aware of the demands of the job, and it is undisputed that she was planning to return to that job. Consequently, it is fair to say that Plaintiff felt she was capable of performing the lifting requirements of the job.

by failing to give controlling weight to Wheeler's report, dated November 20, 2007, which indicated that Plaintiff "cannot work in any capacity." (392-393). However, the Court disagrees. At the outset, it is of course well-settled that Wheeler's statement, that Plaintiff could not "work in any capacity," is a conclusion that is reserved to the Commissioner.[12] Additionally, Wheeler's report purported to express opinions concerning Plaintiff's physical ailments (392), which Wheeler was not qualified to make. And finally, Wheeler, as a clinical social worker/therapist, was not an "acceptable medical source," and the ALJ was not required to give her report controlling weight.[13] See, 20 C.F.R. § 416.913(a)&(d). Consequently, the ALJ did not violate the treating physician rule by failing to give controlling weight to Wheeler's report. Nor does the Court find that the ALJ's determination, essentially giving no weight to the report, was erroneous.

Plaintiff also contends that the ALJ's determination to give little, if any, weight to Wheeler's November 20, 2007 report was erroneous, since the report was supported by Plaintiff's voluminous mental health records, which were signed by both Wheeler and

_____

[12] See, e.g., Arruda v. Commissioner of Social Sec., No. 08-3128-cv, 363 Fed.Appx. 93, 96, 2010 WL 324002 at *2 (2d Cir. Jan. 29, 2010) ("[A] decision as to whether a claimant is 'disabled' is an administrative finding reserved to the Commissioner, and a statement by a treating source that a claimant is disabled should not be disregarded, but is not entitled to controlling weight or special significance.") (citing SSR-96-5p (July 2, 1996)).

[13] Additionally, Wheeler's opinion was based, in part, on Plaintiff's abuse of alcohol and drugs (392), which behavior cannot be relied upon by the Commissioner in making an award of benefits. See, 42 U.S.C.A. § 423 (d)(2)(C) ("An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."); see also, 20 C.F.R. § 404.1535(b)(1) ("The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol."). The ALJ cited this as a reason for giving Wheeler's report little if any weight. (24)

Nanavati.[14] (Pl. Memo of Law at 8) ("[The ALJ] had over <u>200</u> pages of Unity Health records of treatment plaintiff had received since August 2006 wherein Ms. Wheeler was the primary therapist who saw plaintiff the most even though plaintiff had been seen by other therapists and overseen by [Nanavati]."). However, these records provide little, if any, specific information concerning Plaintiff's ability to work. (*See*, 679-770, 874-902) Plaintiff was not working during this period, after having been laid off from her last job in or about January 2004, and she apparently was not seeking employment. Plaintiff was, though, providing full-time care for her granddaughter, of whom she had custody. (703, 740, 756-758, 876, 884, 890, 898). These records never mention the prospect of Plaintiff returning to work, but instead, refer, at several points, to the fact that Plaintiff was pursuing a Social Security disability claim. (759)[15]

In any event, Plaintiff's ability or inability to work was not a focus of Wheeler's/Nanavati's notes. In fact, Wheeler's/Nanavati's periodic reports do not express an opinion as to Plaintiff's ability to function in a "work role," and instead, indicate "NA," presumably meaning "not applicable." (See, e.g., 688, 709) Otherwise, Wheeler's/Nanavati's notes indicate only that Plaintiff initially stopped working at her last job due to CTS, and was later laid off. (*See, e.g.*, 707) Thus, while Wheeler's/Nanavati's records describe Plaintiff's psychological problems, they do not

---

[14]This Court has previously held that it was error for an ALJ to reject a report by a non-physician that is signed by a treating physician. *See, Keith v. Astrue*, 553 F.Supp.2d 291, 300 (W.D.N.Y. 2008) ("It was improper for the ALJ to discount office notes and reports signed by [Dr.] Nanavati as being merely the opinions of Kubrich [social worker].") (*citing Santiago v. Barnhart*, 441 F.Supp.2d 620, 628 (S.D.N.Y. 2006)). Here, the ALJ did not disregard the records that were signed by both Wheeler and Nanavati.

[15]As to that, some of the records indicate, "OCCUPATIONAL: disabled," but do not indicate a basis for the purported disability. (880, 888, 896).

indicate how those problems would affect her ability to work.

However, Wheeler's/Nanavati's notes indicate that, while Plaintiff was often depressed or irritable, mainly about issues involving her family,[16] her intellectual functioning was generally normal. (See: 739 - "clear logical thinking"; 686- "thought form: clear well organized logical"; 880-881- thought form/ intellectual functioning "within normal limits"; 877- concentration "fair"; 885- concentration "fair"; 889 - insight/ judgment/ memory /concentration "fair," intellectual functioning "average"; 893 - concentration "fair"; 897- Insight and judgment "fair," intellectual functioning "average," memory/concentration "fair;" 899 - Appearance, behavior, thought form, and intellectual functioning all "within normal limits," *but see also*: 704- "concentration: difficult at times.")

Moreover, the ALJ clearly gave weight to Wheeler's/Nanavati's treatment notes. *See*, ALJ's Decision (7, 25-27). In that regard, the ALJ found that Plaintiff had three severe mental impairments – alcohol dependency, mood disorder not otherwise specified, and personality disorder not otherwise specified. (26) Because of these impairments, the ALJ found that Plaintiff was "limited to work that [is] simple, low in stress, low in required concentration, and limited in required interpersonal interaction." (27). These findings are not inconsistent with Wheeler's/Nanavati's notes, and in fact, they are consistent with Wheeler's specific findings, concerning Plaintiff's mental functioning, in Wheeler's November 2007 report. (392) Consequently, the Court does

---

[16]At various times, Plaintiff indicated that she was depressed, anxious and/or angry about conflicts with her daughter and daughter's boyfriend, both of whom lived with Plaintiff, problems caring for her grandchildren, and her father's terminal illness.

not agree that the ALJ violated the treating physician rule with regard to Wheeler's/ Nanavati's opinions.

*Assessment of Plaintiff's Credibility*

Plaintiff contends that the ALJ did not properly evaluate her credibility, particularly with regard to her statements concerning the severity of her pain and its limiting effects on her daily activities. For example, Plaintiff states that the ALJ unfairly suggested that she was exaggerating her back pain and her claimed inability to sit for long periods, based on the fact that she did not appear to be in pain at the hearing, during which she remained seated for more than an hour. In that regard, Plaintiff states that she was able to sit through the hearing because she had taken pain medication. Additionally, Plaintiff states that the ALJ failed to credit her good work history prior to the onset of her disability, and also failed to consider the side-effects of her medications on her ability to work. Plaintiff further alleges that the ALJ failed to consider her inability to stoop when he determined her RFC.

At the outset, the Court observes that, at the hearing, when the ALJ asked Plaintiff what symptoms interfered with her ability to work, she stated: "My back, my breathing, and my hands." (55) As for her back, Plaintiff stated that she had constant "chronic pain" in her lower back (56-57). As for her hand, Plaintiff stated that it bothered her, with pain and numbness, when she did things such as washing dishes. (59-61). Plaintiff also indicated that he shoulder hurt at times, depending on what she lifted. (63). With regard to Plaintiff's complaints about her hand and shoulder, the ALJ obviously credited her, at least in part, because he included limitations on her ability to

lift and use her hand as part of his RFC determination.[17]  To the extent that the ALJ did

not fully credit Plaintiff's testimony concerning her wrist/hand and shoulder pain, he

explained his reasoning (21-22), and his reasoning is supported by substantial

evidence.

As for Plaintiff's complaint of pain in her lower back, the ALJ essentially found

such complaints not credible, since there was "no proven medical impairment to support

them." (22); *see also*, (24) ("[Dr. Plotz] said that while [Plaintiff's complaints of back

pain] do appear, subjectively, in many places [in the record], a thorough investigation

has not turned up any medical explanation for them.  An MRI of claimant's lumbosacral

spine showed only minimal degenerative disease consistent with her age, while

electrodiagnostic studies were entirely normal.")  In finding that Plaintiff's alleged back

pain was not a severe impairment, the ALJ stated:

> I [find] that Ms. Ford's complaints of back pain boil down to a multitude of
> subjective complaints (though not with the frequency or severity to which
> she testified) without any acceptable medical diagnosis to explain them.
> To be cognizable under Social Security rules, subjective complaints –
> even if well documented – must be underlain by a proven medically-
> determinable impairment from which they could reasonably be expected
> to arise.  That essential connection is absent in Ms. Ford's case.

(25)   Plaintiff contends that the ALJ's determination on this point was erroneous,

because he failed to consider factors including Plaintiff's daily activities; the location,

duration, frequency, and intensity of her pain; the type, dosage, effectiveness, and side-

effects of her medications; and the treatment she received to relieve her pain. (Pl.

Memo of Law at 12).  Specifically, Plaintiff contends that the ALJ failed to comply with

---

[17]As discussed earlier, in July 2004, Mitten indicated that Plaintiff could return to her usual work, as book binder, which involved lifting and using her hands, four days per week, 4-5 hours per day. (186)

20 C.F.R. § 404.1529 and Social Security Ruling ("SSR") 96-7p.  However, the Court disagrees.

SSR 96-7p states, in pertinent part, that an ALJ must apply certain factors to evaluate a claimant's credibility, when "there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms."  With regard to Plaintiff's back pain, there were no such "medical signs or laboratory findings."  Plaintiff argues to the contrary, since "[a]n MRI of [her] lumbar spine performed on June 5, 2006, revealed mild  degenerative changes at several lumbar levels with mild stenosis at L2-3." (Pl. Memo of Law at 4).  However, Plaintiff's own doctors did not believe that such findings were responsible for Plaintiff's complaints of pain.  In February 2003, Everett noted that Plaintiff's MRI showed degenerative changes at L3-L4, but "no significant neural encroachment." (210).  Consequently, Everett was "*not sure what is causing the right leg symptoms*." (*Id.*) (emphasis added).  Everett ordered a nerve conduction study, which was normal. (211)  Additionally, Everett indicated that Plaintiff could work "in a light-duty capacity full time." (329).  In June 2005, Wilmot indicated that, although Plaintiff complained of back pain,  all laboratory testing was negative. (222)  On June 12, 2006, Everett indicated that Plaintiff's MRI showed "mild lumbar spondylosis." (328)  On February 27, 2007, Stanton indicated that he could find no cause for Plaintiff's back pain. (527) ("Musculoskeletal low back pain.  *It is non-radicular.  It is non-neuropathic*.  I do not have anything to offer on this complaint.  . . . She has a normal neurological exam.") (emphasis added).  On March 16, 2007, Ruetz

reported that she had reviewed Plaintiff's EMG report, which showed "no lumbar radiculopathy, plexopathy, or neuropathy bilaterally." (532) And finally, at the hearing, Plotz opined that there was no identified cause for Plaintiff's back pain. (80) ("The only thing she has on MRI is minimal osteoarthritis that comes with aging. She has had electro diagnostic studies which are normal. The doctors have been unable to ascribe anything.") Consequently, the Court finds that the ALJ did not err in evaluating Plaintiff's credibility concerning her back pain. *See*, SSR 96-7p ("If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.").

Lastly, in arguing that the ALJ's determination was erroneous, Plaintiff argued that it was "of most significance" that she had been found disabled by the Commissioner, in connection with a *different* application for disability benefits, for the period immediately following the period at issue in this action, February 1, 2006 - March 18, 2008. Plaintiff argued that this later determination was based on the same medical evidence as in this case, "as well as medical evidence since the ALJ decision." (Pl. Memo of Law at 9). Plaintiff did not specify the nature of the additional medical evidence that was submitted in connection with the later application. However, following oral argument, and at the Court's request, Defendant's counsel investigated the basis for this later finding of disability, and reported that the later decision was based on different medical evidence. In particular, it seems that the later determination was based, in part, on the fact that Plaintiff's heart condition and COPD had worsened:

30

Appellate counsel for the SSA closely examined the medical records submitted in Ms. Ford's subsequent application for benefits and found that there was substantially different and stronger evidence in the later application supporting the SSA's disability finding. In particular, her primary care physician, Dr. Wilmot, made a definitive finding in his June 2009[18] progress notes that Ms. Ford was unable to work in any capacity. Further, a consultative exam performed . . . in June 2009 found that Ms. Ford was limited to walking one block, lifting five pounds, carrying ten pounds, and that her exertional abilities were severely limited due to shortness of breath and severe coronary disease, likely exacerbated by her continued smoking.

Letter of Kathryn L. Smith, Assistant United States Attorney, dated October 13, 2010.

The Court finds that the Commissioner's later decision, finding Plaintiff disabled, does not require the reversal of the Commissioner's determination in this action.

## CONCLUSION

For the reasons discussed above, Defendant's motion [#6] for judgment on the pleadings is granted, Plaintiff's cross-motion [#9] for the same relief is denied, and this action is dismissed. So Ordered.

Dated: Rochester, New York
        November 3, 2010

ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge

---

[18]The period at issue in this case is February 1, 2006 through March 18, 2008.